UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANTONIO McCRAY, ET AL.,

        Plaintiffs,

v.

JEREMY PITTMAN AND COLIN
CONNAIRE,

        Defendants.

_____/

Case No. 09-13868

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT [15]**

     This § 1983 action arises from events that occurred at Plaintiffs' home on February

15, 2009. Plaintiffs allege that by conducting a warrantless search of their residence and

seizure of their persons, Defendant Officers Jeremy Pittman and Colin Connaire violated

their Fourth Amendment rights. This matter is now before the Court on Defendants' motion

for summary judgment. Defendants argue that no Fourth Amendment violation occurred

and that they are furthermore entitled to qualified immunity on Plaintiffs' claims. For the

reasons discussed below, this Court GRANTS Defendants' motion for summary judgment.

**I.    Facts**

    **A.  Events Leading Up to 911 Call**

     On February 15, 2009, Carmen Banks and William Woody were engaged in a "very

loud argument" in an alley behind a restaurant in Grosse Pointe Park, Michigan. (Defs' Ex.

1, Banks Dep. at 9.) Woody testified that he had not been drinking but that Banks was

"drunk" and he was attempting to stop her from driving home. (Defs.' Ex. 2, Woody Dep. at 9.) Banks stated that both she and Woody were "tipsy." (Banks Dep. at 25.) According to the testimony of Banks and Woody, one or two people, probably male, came onto the roof outside of the adjacent apartment. (Banks Dep. at 13, Woody Dep. at 10.) Although it was dark and she "couldn't really see," Banks said that she saw two people on the roof, who began taunting and throwing popcorn at the couple. (Banks Dep. at 13-14.) She did not see where these people came from. (*Id.* at 22.) Woody testified that there was one person on the roof, who said "you just wait a minute" before he went into a door and returned seconds later with something silver that looked like a gun. (Woody Dep. at 10-18.) Woody saw the man cock the "gun" and heard it "click." (*Id.* at 19.)

Banks did not testify to seeing a man with a gun on the roof. She said that following the popcorn-throwing, Woody and Banks were sitting in her car when a man wearing a dark hood walked up, visible in the rearview mirror, and "gestured like he had a gun" (Banks Dep. at 16), although Banks never saw the gun itself. (*Id.* at 29.) Banks testified that she did not know where the person in the rearview window came from or went, but that she connected him in her mind with the people who were throwing popcorn from the roof. (*Id.* at 25-31.) At some point, Banks called the police on her cell phone and told them that someone had pulled a weapon on her and Woody. (*Id.* at 17.)

## B. Officers' Arrival

Following Banks' call, a dispatch went out stating that "a man with a gun had threatened a subject in the alley." (Defs' Ex. 8, Loosvelt Dep. at 9.) Police officers arrived on the scene almost immediately, and Banks told them that she and Woody had seen a man with a weapon and that she assumed it was the same person from the roof of the

apartment. (Banks Dep. at 17.) Woody spoke to an officer and told him that he thought he had seen a silver gun. (Woody Dep. at 14.) According to the incident report prepared by Officer Pittman, both Banks and Woody told police that two black males, one wearing a white hooded shirt, exited the door of the second-story apartment. (Defs.' Ex. 3, 2/15/09 Incident Report.)

Three Detroit police officers were the first to arrive, followed by Officer Pittman, who was the primary Grosse Pointe Park officer on the call. (Pittman Dep. at 9-10.) Upon arrival, Officer Pittman spoke with one of the Detroit officers, who told him that the couple was having an argument in the alley and that "somebody had come out of the apartment . . . and brandished a weapon, threatened them with a handgun, and then went back inside the apartment." (*Id.* at 15.) Pittman spoke with Woody and Banks, who confirmed this information. (*Id.*) Officer Connaire, called in as a backup, never spoke to Woody or Banks, but relied on information conveyed to him by the dispatch report and Officer Pittman. (Defs.' Ex. 5, Connaire Dep. at 10.) Sometime later, Grosse Pointe Park Sergeant Jeffrey Longo and Officer Ronald Loosvelt also arrived. (Defs.' Ex. 9, Longo Dep. at 9, Loosvelt Dep. at 9.) Neither spoke to Banks or Woody. (Longo Dep. at 11, Loosvelt Dep. at 13.)

Banks wrote out a statement for police and signed Woody's name. (Banks Dep. at 20.) She testified that Woody told her what to write (Banks Dep. at 28), although Woody said that he never saw or read the statement (Woody Dep. at 14). The statement, Defendants' Exhibit 3, said: "We were having an (sic) conversation when 2 men interrupted and pulled a gun threatening to shoot us. Saying; you just wait a minute Look!! and He cocked the weapon. We pulled off and called police. One man walked behind my van waving. The man with the white hoody." This statement and the conversation with Banks and Woody was

3

the "sum and substance" of the information known to Pittman as he approached the door of the McCray residence.  (Pittman Dep. at 19.)

### C.  Entry into McCray Residence

After speaking with Woody and Banks, Officer Pittman, Officer Connaire and two Detroit officers went to the rear door of the second-story apartment and knocked.  (Pittman Dep. at 20-23.)  Antonio McCray, Jr., then age 15, answered the door.  (McCray, Jr. Dep. at 13-14.)  The officers told McCray, Jr. to put his hands "where they can see them," and he complied.  (McCray, Jr. Dep. at 14.)  According to Karkea Jones, McCray, Jr.'s 17 year old sister, the officers said that they had received a call that there was a gun in the apartment.  (Defs.' Ex. 7, Jones Dep. at 16.)  When asked who else was home, McCray, Jr. told police that his sisters and his sister's friend were also in the apartment.

The officers' accounts confirm McCray, Jr.'s statement.  From the doorway, Officer Pittman could see two teenagers, a male and a female, and "two small children jumping up and down on an adult male lying on a mattress on the floor."  (Pittman Dep. at 22.)  According to Officer Connaire, the children were saying "Daddy wake up."  (Connaire Dep. at 13.)[1]  Officer Pittman noted that the occupants of the apartment included two young men, consistent with the signed witness statement of who Woody had seen on the roof.  Neither McCray, Jr., nor the other male, 19 year old LeManuel Rideout, were wearing clothes matching Woody's description. (Pittman Dep. at 24.)[2]

---

[1]Jones and McCray, Jr. testified that their father, McCray, Sr.,  had taken Nyquil for a cold. (Jones Dep. at 15, McCray, Jr. Dep. at 12), while Pittman's report stated that McCray Sr. was "passed out drunk in bed" (Incident Report).

[2]McCray, Jr. testified that he and Rideout "peeked out" the back door during the argument between Woody and Banks, but did not leave the apartment at any time.

4

Officers Pittman and Connaire entered the apartment and walked to the back room, where they told the young girls to leave and tried, unsuccessfully, to wake McCray, Sr. (Pittman Dep. at 24-5.)  Both officers testified that their reasons for entering were a concern for the children in view of the report of a gun and the fact that the adult would not wake up. (*Id.* at 23.)  Officer Connaire stated that he believed that this amounted to "exigent circumstances" necessitating that he enter even without a warrant.  (Connaire Dep. at 20.)

Following their attempt to wake McCray, Sr., Officers Pittman and Connaire made a "cursory search" and found no weapon.  (Pittman Dep. at 25.)  Officer Pittman testified that the search was limited to the back room (*id.*), although the testimony of McCray, Jr. and Jones suggests that the search was more extensive.  (Jones Dep. at 18 , McCray, Jr. Dep. at 18.)  According to Officer Connaire, the focus of the search was for someone with a white hooded sweatshirt, as per Woody's statement.  (Connaire Dep. at 15.)  The main concern was "anyone with a gun still hiding" in the apartment. (*Id.*)  No weapon or white hooded shirt were found.  (*Id.* at 17.)

While Officers Pittman and Connaire were in the back room, other officers directed Jones, McCray, Jr., Rideout, and the two younger girls to the patio area outside the apartment.  At this point, McCray, Jr. testified, he asked an officer if they had a warrant, and the officer gave no response.  (McCray Dep. at 15.)[3]  Officers Pittman and Connaire did not hear this exchange. (Pittman Dep. at 30.)

(McCray, Jr. Dep. at 9-10.)

[3]It is undisputed that the officers had no warrant. (Longo Dep. at 15.)

Once outside, according to Jones, the teenagers and younger girls were instructed to put their hands on wall and not move. (Jones Dep. at 17.) They stood outside for five to ten minutes (McCray, Jr. Dep. at 16) in "snow and ice." (Jones Dep. at 25.) At one point, Jones asked the officer standing with them if they could go back into the house to get shoes. (Jones Dep. at 25.) The officer denied her request, saying that they would be back in the house "in a minute." (*Id.* at 26.)

None of the deposed Grosse Pointe Park officers apparently were those who took the Plaintiffs outside or stood with them on the patio. Officer Loosvelt said that when he arrived, he encountered four people standing outside the apartment. (Loosvelt Dep. at 9.) Loosvelt testified that the people – one male and one female teenager and two younger females – were "just standing there" and were not accompanied by any officer, although they complained to him that they were cold. (*Id.* at 9-10.) Loosvelt confirmed that none of the four had shoes on, and that there was "snow on the ground," but "not where they were standing. (*Id.*) Sergeant Longo also saw children on the roof outside the apartment. (Longo Dep. at 16.)

After five to ten minutes, Jones and McCray, Jr. said that they came back inside and waited while the officers completed their search. Loosvelt let them back in and stood with them in the kitchen, but "did not take any police action." (Loosvelt Dep. at 12.) Jones stated that the officers "sat us down in the kitchen" and "wouldn't let" them go anywhere else in the apartment until the search was over. (Jones Dep. at 26.) Jones estimated that the officers were in the apartment for about 25 minutes. (Jones Dep. at 20.) Officer Pittman testified that it was ten minutes. (Pittman Dep. at 26.) In any event, records indicate that

a total of thirty-five minutes elapsed between the time that the dispatch went out and when Officer Pittman returned to the station and filed his report. (Pittman Dep. at 32.)

Plaintiffs Karkea Jones and Antonio McCray, Sr., on behalf of himself and McCray, Jr., subsequently filed a complaint in state court asserting § 1983 claims and alleging that Defendants Pittman and Connaire violated their Fourth Amendment right to be free from unreasonable search and seizure. Plaintiffs also alleged state law claims. On September 30, 2009, Defendants filed a notice of removal of the action to this Court. The state law claims were remanded and are now pending in state court. Defendants filed their motion for summary judgment on May 3, 2010.

## II.    Summary Judgment Standard

Summary judgment is proper where the pleadings and discovery materials "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A moving party may meet its burden "by 'showing'–that is, pointing out to the district court, that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. V. Catrett,* 477 U.S. 317, 325 (1986). When the moving party has done this, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industries Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). There must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.,* 306 F.3d 427, 432 (6th Cir. 2002). In evaluating a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970).

To survive summary judgment on a § 1983 claim, a plaintiff must set forth facts that, when construed favorably, establish a genuine issue of material fact as to two elements: (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law. *McQueen v. Beecher Cmty. Sch.,* 433 F.3d 460, 463 (6th Cir. 2006). Only the first prong is at issue here.

## III. Analysis

### A. Warrantless Entry and Search of McCray Residence

Because "the first  and most important principle" of the Fourth Amendment is that searches must be cleared in advance as part of the judicial process, warrantless searches are presumptively unreasonable. *United States v. Chambers,* 395 F.3d 563, 565 (6th Cir. 2005). This rule is subject to only limited exception, *id.,* and "qualification for this exception is not easy." *United States v. Purcell,* 526 F.3d 953, 960 (6th Cir. 2008). In order for a warrantless search to meet constitutional standards, there must be both probable cause and an emergency justifying the search. *Chambers,* 395 F.3d at 565. Courts will only permit such a search under "extraordinary circumstances." *Id.* The defendant bears the burden of proving the existence of a legitimate emergency or exigency. *United States. v. Ponder*, 240 F. App'x 17, 20 (6th Cir. 2007).

#### 1. Probable Cause

The Supreme Court has defined probable cause, at least for the purposes of making an arrest, as the "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. Defillippo,* 443 U.S. 31, 37 (1979). In ascertaining probable cause,

police officers are entitled to rely on information provided by a police dispatcher and presume that information is accurate and reliable. *Feathers v. Aey,* 319 F.3d 843, 851 (6th Cir. 2003). Officers may also rely on information provided by known informants – although not necessarily that provided by anonymous sources. *See id.* at 848.

Although probable cause does not have to be based on an officer's personal observations, "some eyewitness tips, completely lacking in indicia of reliability, would either warrant no police response or require further investigation before a forcible stop of a suspect would be authorized." *Adams v. Williams*, 407 U.S. 143, 147 (1972). In some situations, however, such as "when the victim of a street crime seeks immediate police aid and gives a description of his assailant," an eyewitness report is sufficient to establish probable cause. *Id.*

Here, the sort of immediacy that the Court recognized in *Adams* is present; the facts "within the officers' knowledge" were based on a dispatch report that "a man with a gun had threatened subject," and on the accounts of Woody and Banks, two identified witnesses who had submitted a signed statement. The officers therefore had probable cause to believe that someone had threatened the witnesses with a gun and then fled into the McCray's apartment. At a minimum, the officers could have reasonably believed that they had probable cause, as required for qualified immunity (discussed below).

In the context of obtaining a search warrant, the judge issuing the warrant must decide whether there is a "fair probability that contraband or evidence of a crime will be found in a particular place" for the purpose of determining if there is probable cause to search. *United States v. Gunther,* 551 F.3d 472, 479 (6th Cir. 2009) (quoting *Illinois v. Gates,* 462 U.S. 213, 238-9 (1983)). An application for a search warrant must contain sufficient

allegations to support a finding that there is a "nexus between the location to be searched and probable criminal activity." *See id.* at 481 and *United States v. Khami,* 362 Fed. Appx. 501, 504 (6th Cir. 2010). Although a search warrant was not sought in this case, under the "nexus" test, the officers would have had probable cause to search based on the report from Banks and Woody that someone with a gun had threatened them ("probable criminal activity") and then fled into the McCray's apartment ("the location to be searched").

### 2. Exigent Circumstances

In their response to Defendants' summary judgment motion, Plaintiffs do not strongly dispute the issue of probable cause, but focus on the purported lack of exigent circumstances. Plaintiffs argue, correctly, that the existence of probable cause will not excuse the warrantless search absent exigent circumstances. *See Chambers,* 395 F.3d at 565.

In determining whether exigent circumstances were present in a particular case, the inquiry is whether the "facts are such that an objectively reasonable officer confronted with the same circumstances could reasonably believe that exigent circumstances existed." *Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002). This is generally a factual question for a jury. *Walters v. Stafford,* 317 F. App'x 479, 480 (6th Cir. 2009). In cases where "the underlying facts are essentially undisputed," however, and where "a finder of fact could reach but one conclusion as to the existence of exigent circumstances, the issue may be decided by the trial court as a matter of law." *Id.*

In deciding whether exigent circumstances were present, courts consider the "totality of the circumstances and the inherent necessities of the situation at the time." *Ziegler v. Aukerman,* 512 F.3d 777, 787 (6th Cir. 2008) (internal quotation marks and citation

omitted).  The Sixth Circuit has traditionally found the existence of exigent circumstances in four situations: 1) the hot pursuit of a fleeing felon; 2) the imminent destruction of evidence; 3) the need to prevent a suspect's escape; and 4) the risk of danger to police or others.  *Ponder*, 240 F. App'x at 20.  Police do not have to witness a crime for exigent circumstances to be present.  *Ewolski,* 287 F.3d at 503.  Defendants argue that due to the presence of children and potentially an individual with a gun in Plaintiffs' apartment, there was a sufficient "risk of danger" to excuse a warrantless entry.  To establish that a risk of danger justified the search, Defendants must show that there was a near-certain risk of serious injury posed to the officers or others, requiring swift action.  *Ponder,* 240 F. App'x at 20.  Courts have found that a such a risk exists where 1) the officers have a reasonable belief that a suspect in the home has a weapon; and 2) the officers can demonstrate that the suspect had a willingness to use the weapon.  *Id.*

In past Sixth Circuit cases, a "willingness to use" a weapon generally has equated to an actual firing of gunshots.  For example, in *United States v. Johnson*, 106 F. App'x 363 (6th Cir. 2004), police observed a suspect fire and reload a shotgun and then flee into a house with the gun.  The court denied a motion to suppress evidence obtained through a warrantless search, finding that exigent circumstances justified a two to three-minute "protective sweep" of the home to  search for weapons and persons.  The court in *Johnson* based its "risk of danger" finding partially on the fact that children reportedly resided in the home.  In that situation, the officers had "ample justification" to fear for their own safety as well as the safety of others: "Police are not required to wait for injury or death to occur in their presence before acting to protect people from a gunman who has amply demonstrated his propensity to use his weapon."  *Johnson,* 106 F. App'x at 368.

Exigent circumstances may also be established where a witness or victim, rather than a police officer, observes gunshots. In *Causey* v. *City of Bay City*, 442 F.3d 524 (6th Cir. 2006), which addressed a § 1983 claim, a neighbor reported hearing six gunshots from the plaintiffs' backyard. Upon arrival, police found bullet casings in the plaintiffs' yard. The court upheld a warrantless search because "immediate police action" was necessary to ascertain whether anyone inside was injured. *Causey*, 442 F.3d at 528. *See also Ponder*, 240 F. App'x 17 (finding that exigent circumstances necessitated entry where victim reported that defendant had fired shots and victim identified defendant to police as defendant retreated into his home); *Ewolski,* 287 F.3d at 502 (holding that circumstances justified warrantless entry into home of man who had brandished his weapons in front of home health care workers in menacing fashion, and had told relative that his guns were "loaded and ready," leading to a reasonable belief that man posed immediate threat to his family); and *Hancock v. Dodson*, 958 F.2d 1367, 1375-76 (6th Cir. 1992) (concluding that exigent circumstances existed where officers received information indicating that shots had been fired, the suspect was suicidal, possibly homicidal, and had "threatened to kill any police officer who arrived on the scene").

By contrast, in *United States v. Bates*, 84 F.3d 790 (6th Cir. 1996)*,* where an informant merely reported that a suspect possessed a gun in his home, the court found the circumstances insufficient to waive the requirement that officers knock and announce their presence before executing a search warrant. As the court explained*,* "evidence that firearms are within a residence, by itself, is not sufficient to create an exigency" absent

some indication that someone inside is likely to use the weapon. *Bates,* 84 F.3d at 795.[4]

This case falls somewhere between *Johnson* and *Bates.* Based on the information known to Officers Pittman and Connaire at the time of their entry, the suspect had not fired a gun; he had at most displayed one. Nothing was known about the identity or character of the suspect; however, the brandishing of a weapon is a threatening act which goes beyond mere possession of a firearm and demonstrates a "propensity to use" it, supporting a finding of exigent circumstances here.

In addition to considering whether a weapon is involved, courts have emphasized danger to innocent people, particularly minors, as an important consideration for purposes of determining whether exigent circumstances are present. *See, e.g. Johnson,* 106 F. App'x at 36; *Ferguson v. Unicoi County,* No. 03-369, 2005 WL 2407664, at *4 (E.D. Tenn. September 29, 2005), *aff'd,* 222 F. App'x 508 (6th Cir. 2007) (finding that where children in the residence appeared to be huddled together instead of playing normally, suggesting the presence of an intruder, exigent circumstances justified entry). Defendants accordingly focus on the presence of unsupervised children as a justification for their entry. As in *Johnson,* this is an additional factor weighing in favor of a finding of exigent circumstances.

Defendants further argue that application of the balancing test set out in *United States v. Rohrig,* 98 F.3d 1506 (6th Cir. 1996), supports a finding of exigent circumstances here outside of the four established categories recognized in *Ponder.* In determining whether exigent circumstances excused a warrantless entry of the defendant's home, the *Rohrig*

_____

[4]According to *Bates,* specific threats to an officer's safety, a violent criminal record, or a "verified reputation of a suspect's violent nature" can also lead officers to believe that a suspect is willing to use a weapon, thereby constituting exigency. *Bates,* 84 F.3d at 795. None of these factors are asserted by Defendants here.

court considered "(1) whether immediate government action was required, (2) whether the governmental interest was sufficiently compelling to justify a warrantless intrusion, and (3) whether the citizen's expectations of privacy was diminished in some way." *Rohrig*, 98 F.3d at 1521. The court concluded that a compelling governmental interest supported a warrantless entry where the police entered to abate a "noxious disturbance" to the community in the form of loud music: "Having found that an important 'community caretaking' interest motivated the officers' entry in this case, we conclude that their failure to obtain a warrant does not render that entry unlawful." *Id.* at 1523.

The *Rohrig* test was employed outside of the nuisance context in *United States v. Johnson, supra.* In addition to recognizing the traditional "risk of danger" exigency, the *Johnson* court found exigent circumstances under the *Rohrig* factors: "immediate action was required" because an armed suspect "fled into a house thought to be occupied. It was a compelling governmental interest to protect the occupants from harm, especially if they were children, as reported. And, defendant's expectation of privacy was diminished because he had fired his weapon outdoors where any passerby could witness his unlawful conduct." *Johnson,* 106 F. App'x at 367.

As noted above, this case is factually similar to *Johnson*: a possibly armed person who had threatened witnesses was potentially inside the McCray residence, and the presence of children heightened the governmental interest in ensuring that the residence was safe. A finding of exigent circumstances here under *Rohrig,* in addition to the traditional *Ponder* analysis, would therefore be appropriate.

As the varied case law illustrates, whether exigent circumstances existed in a particular case is a highly fact-dependent inquiry. Defendants acknowledge that no case

14

is precisely on point, but discuss analogous cases from this and other Circuits. This case law supports a finding of exigent circumstances here. Moreover, even without exigent circumstances present, Defendants can be protected by qualified immunity.

### 3. Qualified Immunity

Notwithstanding the issue of exigent circumstances, Defendants argue that qualified immunity protects them from liability and entitles them to summary judgment. A defendant government official enjoys qualified immunity on summary judgment unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established. *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394 (6th Cir. 2009). Once it is determined that the right is clearly established, the court must determine "whether the plaintiff has alleged sufficient facts supported by sufficient evidence to indicate what [the officer] allegedly did was objectively unreasonable in light of [the] clearly established constitutional rights." *Dickerson v. McClellan*, 101 F.3d 1151, 1158 (6th Cir. 1996) (quoting *Adams v. Metiva*, 31 F.3d 375, 387 (6th Cir.1994)) (alteration in original).

Where a defendant raises a qualified immunity defense, the plaintiff then bears the burden of proving that the defendant is not shielded by qualified immunity. *Walters v. Stafford,* 317 F. App'x 479, 485 (6th Cir. 2009). Application of the qualified immunity doctrine is a matter of law for the court. *Dickerson,* 101 F.3d at 1157. The inquiry is conducted from the perspective of the officers, considering only the facts they knew at the time of the incident. *Id.* at 1155.

The test for qualified immunity is meant to be highly deferential to officials, protecting "all but the plainly incompetent or those who knowingly violate the law." *Humphrey v.*

15

*Mabry*, 482 F.3d 840, 847 (6th Cir. 2007) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986))  The official will be immune "if officers of reasonable competence could disagree on whether the conduct violated the plaintiff's rights." *Id. (*internal quotation marks and citation omitted).  As the Sixth Circuit has stated, the Fourth Amendment "does not require officers to use the best technique available as long as their method is reasonable under the circumstances." *Dickerson,* 101 F.3d at 1160.  Even defendants who have in fact violated constitutional rights may be protected if their actions were nevertheless objectively reasonable at the time of the violation.  *Davis v. Scherer,* 468 U.S. 183, 190 (1984).  *See also O'Brien v. City of Grand Rapids,* 23 F.3d 990, 1000 (6th Cir. 1994) (concluding that "it is clear that the officers were not, in law, excused on exigent circumstance grounds from obtaining a warrant before invading O'Brien's house.  But we cannot say that no reasonable officer . . . could conclude that there were exigent circumstances excusing the requirement that a warrant be obtained").

The right to be free from warrantless searches of one's home absent exigent circumstances is "clearly established" for the purposes of evaluating a qualified immunity defense.  *O'Brien,* 23 F.3d at 999.  Defendants here admit that they conducted a search of the Plaintiffs' residence without a warrant, so the remaining issue is whether a reasonable police officer in this situation could have believed that a warrantless entry was justified based on the existence of probable cause and exigent circumstances.  *See id.*

In past cases, the Sixth Circuit has awarded qualified immunity to defendants on facts similar to those presented here, even absent a finding of exigent circumstances.  In *Walters,* for example, the Sixth Circuit held that police officers reasonably believed that their warrantless entry was necessitated by emergency circumstances where they knew

that a suspect who had fired a gun outside to disperse a crowd remained in his home with the gun and other unknown people. *Walters,* 317 F. App'x at 490. The court in *Walters* found it unnecessary to resolve the issue of exigent circumstances because "even if defendants were incorrect in concluding that exigent circumstances existed, they were not objectively unreasonable in believing in their existence." *Id.*

Similarly, in *Smith v. Stone*, 40 F. App'x 197 (6th Cir. 2002), the court held that an officer had a reasonable belief that exigent circumstances justified a warrantless search of plaintiffs' residence based on information, provided by her partner, that an armed suspect ran into the home. She was thus qualifiedly immune from the plaintiffs' § 1983 claim that her warrantless entry violated their Fourth Amendment rights. Finally, in *Dickerson v. McClellan*, 101 F.3d 1151 (6th Cir. 1996), where officers had been informed that an intoxicated person inside a house had fired nine shots, the court held that it was not unreasonable for officers to infer from seeing a telephone cord leading into another room that a victim had grabbed the telephone to call for help. It was therefore reasonable for them to decide that an unannounced entry was immediately necessary to protect those inside from danger. *Dickerson,* 101 F.3d at 1158.

As in these cases, the officers here could have reasonably believed that a warrantless entry was necessary because of the possible presence of a gun, as well as the presence of other people, including children, in the apartment. Although deposition testimony shows that Woody and Banks' account of the events is vague and perhaps unreliable, the qualified immunity inquiry is conducted from the perspective of the officers at the time of the alleged violation. The officers could have reasonably believed that an armed man had threatened Banks and Woody with a gun before retreating into the McCray apartment. Moreover,

given that "one exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury," *Brigham City v. Stuart*, 547 U.S. 398, 403, (2006), the officers may have reasonably believed that McCray, Sr. was in need of such assistance – even though, in hindsight, he was not.

Even if, as in *O'Brien,* exigent circumstances and probable cause were not in fact present, the evidence here supports at least a reasonable belief on the part of the officers that their warrantless entry was justified. While Defendants bear the burden of demonstrating exigent circumstances, it is Plaintiffs who must overcome the presumption that Defendants are entitled to qualified immunity. Plaintiffs have not met this burden because they have not shown that Defendants' actions were objectively unreasonable in this situation. Summary judgment on the illegal search claim is thus appropriate for Defendants on this ground.

### B. Illegal Seizure Claim

In the summary judgment motion and responses, the parties do not discuss the illegal seizure allegation contained in the complaint. The court will nevertheless address it here in order to rule on summary judgment.

For Fourth Amendment purposes, the "'seizure' of an individual takes place when 'by means of physical force or a show of authority, his freedom of movement is restrained.'" *Ingram v. City of Columbus,* 185 F.3d 579, 591 (6th Cir. 1999) (quoting *United States v. Mendenhall*, 446 U.S. 544, 553 (1980)). An individual's freedom of movement is restrained when "in view of all of the circumstances . . . a reasonable person would have believed that he was not free to leave." *Mendenhall*, 446 U.S. at 554. The Fourth Amendment applies

to "even those seizures of the person which do not eventuate in a trip to the station house and prosecution for crime." *Ingram v. City of Columbus,* 185 F.3d 579, 595 (quoting *Terry v. Ohio*, 392 U.S. 1, 16 (1968)). Generally, a police officer must have probable cause to seize an individual. *Ingram*, 185 F .3d at 591.

Viewing the evidence in the light most favorable to the Plaintiffs, a seizure occurred here. During the officer's search of the McCray residence, a reasonable person in the Plaintiffs' situation would have believed he was not free to leave, a belief underscored by the officer's refusal to let Jones go into the house to get shoes, as well as by her statement that the officers "wouldn't let" her and her siblings leave the kitchen once inside. (Jones Dep. at 26.) Even though the officers did not transport Plaintiffs away from their home, they nonetheless limited their freedom of movement, thereby constituting a seizure. *See, e.g.*, *Smith v. Stone,* 215 F.3d 1327 (6th Cir. 2000) (holding that plaintiffs were seized when, during a search of their residence, police officers confined them to a limited area outside of the house) and *Burchett v. Kiefer,* 310 F.3d 937, 942 (6th Cir. 2002) (holding that neighbor was "seized" within the meaning of the Fourth Amendment when he was handcuffed and placed in squad car by police officers who feared he would interfere with execution of warrant to search adjacent residence).

Federal courts assess such seizures under a standard of "reasonableness," for "what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures." *Terry,* 392 U.S. at 9. In determining whether a seizure was reasonable, the inquiry is a dual one: whether the officer's action was justified at its inception, and whether

it was reasonably related in scope to the circumstances which justified the interference in the first place. *Id.* at 19-20.

The court does not have to consider the reasonableness of the seizure in this case, however, because the evidence does not indicate that Defendant Officers Pittman and Connaire played any role in the detention of the Plaintiffs. Although both Jones, McCray, Jr., and other witnesses testified that the Plaintiffs were out on the roof at some point during the search, neither of the Defendant officers claim to have seen or been involved in this situation. Officer Connaire stated that he did not "recall seeing them because I know at that point I had moved farther into the apartment to wake up Mr. McCray." (Connaire Dep. at 14). Officer Pittman said that he was with Officer Connaire the whole time, and "never saw [Plaintiffs] standing on the back roof." (Pittman Dep. at 27).

Where the evidence does not establish that an officer was personally involved with the alleged deprivation of a constitutional right, that officer is protected by qualified immunity. *See Walters,* 317 F. App'x at 487. In *Walters*, the Sixth Circuit held that an officer was entitled to qualified immunity as to the plaintiff's Fourth Amendment illegal seizure claim because there was no evidence that the officer had personally handcuffed, transported, or detained the plaintiff. *Id. See also Smith v. Stone,* 215 F.3d 1327 (6th Cir. 2000) (holding that, although plaintiffs alleged facts that would equate to an unreasonable seizure, defendants were protected from suit because plaintiffs failed to establish that any of the named defendants actually participated in the seizure) and *Duncan v. Jackson,* 243 F. App'x 890, 897 (6th Cir. 2007) (finding that sheriff was not personally involved in seizures of occupants of house, and, thus, he had qualified immunity from those occupants' unlawful seizure claim).

Similarly, Jones and McCray, Jr. do not specifically identify either Officer Pittman or Officer Connaire as the officers who held them on the roof or inside the apartment. In fact, it is consistent with the testimony of all the parties that the named Defendants were not outside with the Plaintiffs, but remained in the apartment searching for a gun or gunman. Defendants are therefore entitled to qualified immunity on the illegal seizure claim.

## IV. Conclusion

For the above-stated reasons, Defendants' motion for summary judgment is GRANTED.


s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: August 9, 2010

I hereby certify that a copy of the foregoing document was served upon counsel of record on August 9, 2010, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager